James Randall WILLIS II, by his next friend and father, James Randall WILLIS, Plaintiff-Appellant,

v.

ANDERSON COMMUNITY SCHOOL CORPORATION, Defendant-Appellee.

No. 98-1227.

United States Court of Appeals, Seventh Circuit.

Argued April 9, 1998.

Decided Sept. 9, 1998.

As Amended on Denial of Rehearing and Suggestion for Rehearing En Banc Oct. 28, 1998.

Kenneth J. Falk (argued), Indiana Civil Liberties Union, Indianapolis, IN, for Plaintiff–Appellant.

Robert M. Baker, III (argued), William C. Wagner, Johnson, Smith, Pence, Densborn, Wright & Heath, Indianapolis, IN, for Defendant–Appellee.

Before CUMMINGS, CUDAHY, and RIPPLE, Circuit Judges.

CUDAHY, Circuit Judge.

In December 1997, high school freshman James Willis was suspended for fighting with a fellow student. Upon Willis' return to school and pursuant to the policy of the Anderson Community School Corporation (Corporation), he was informed that he would be tested for drug and alcohol use. When Willis refused to provide a urine sample, he was suspended again and advised that if he refused to submit to the test upon his return, he would be deemed to have admitted unlawful drug use and would be suspended a third time pending expulsion proceedings. Willis filed suit and claimed, in relevant part, that the Corporation's policy violates the Fourth and Fourteenth Amendments of the United States Constitution. The district court denied Willis' motion for a preliminary injunction and then entered a judgment on the merits in favor of the Corporation. We reverse.

## I. The Policy

In 1996, officials from two high schools in Anderson, Indiana, met to discuss growing disciplinary problems and their perception of increased drug and alcohol use among students. In an effort to address the problem, the Corporation organized a committee of parents, community leaders, school officials and personnel. The committee reviewed the drug and alcohol policies of other Indiana school districts, the results of tests administered pursuant to the policies, and literature discussing the causal nexus between substance abuse and disruptive behavior. The committee eventually formulated a testing policy for the Corporation's secondary schools, which was adopted by the school board in August 1997.

In addition to clarifying that the Corporation will test its students on the basis of individualized suspicion, the policy mandates a drug and alcohol test for any student who: possesses or uses tobacco products; is suspended for three or more days for fighting; is habitually truant; or violates any other school rule that results in at least a three-day suspension.[1] The policy explains that its purpose is "to help identify and intervene with those students who are using drugs as soon as possible and to involve the parents immediately." Students do not receive additional punishment when they test positive, and results are disclosed only to parents and a designated school official. However, students who test positive may be expelled from school if they fail to participate in a drug education program. And, as Willis' story illustrates, a student who refuses to undergo a test is considered to have admitted unlawful substance use.

## II. Discussion

■■■ Two points are uncontested. First, the Fourth Amendment, which applies to the states by virtue of the Fourteenth Amendment, protects students from unreasonable searches by public school officials. *See New Jersey v. T.L.O.*, 469 U.S. 325, 333, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). And second, the collection and testing of urine is a "search" within the meaning of the Fourth Amendment. *See Chandler v. Miller*, 520 U.S. 305, 117 S.Ct. 1295, 1300, 137 L.Ed.2d 513 (1997); *Schaill by Kross v. Tippecanoe County Sch. Corp.*, 864 F.2d 1309, 1311–12 (7th Cir.1988). Taken together, these two propositions mean that the Corporation's drug and alcohol screen is a search that is subject to the requirements of the Fourth Amendment. The district court found it was reasonable— and hence constitutional—for the Corporation to search Willis because (1) Willis' conduct created individualized suspicion of drug use, and (2) because the special needs of the

1. A student receives a suspension of at least three days for: computer tampering; disruptiveness on the bus (fourth offense); disruptiveness in the classroom (fifth offense); fighting; leaving campus without permission; possession of or being under the influence of an illegal substance; possession of stolen property; possession of tobacco products (second offense); profanity directed at faculty or staff; smoking; stealing; tardiness (sixth offense); trespassing at another school; and truancy (second offense). It is unclear why the drug testing policy expressly mentions fighting and habitual truancy, since this misconduct is apparently covered by the provision that mandates a test after any suspension of at least three days.

Corporation outweighed Willis' privacy interest. We consider each of these findings in turn.

### A. Individualized Suspicion

School officials do not need to establish probable cause to justify the search of a student; instead, "such a search is permissible if it is both 'justified at its inception' and 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *Bridgman v. New Trier High Sch. Dist.*, 128 F.3d 1146, 1149 (7th Cir.1997) (quoting *T.L.O.*, 469 U.S. at 341–42, 105 S.Ct. 733). On appeal, Willis challenges only the district court's conclusion that the Corporation's search would have been "justified at its inception." To satisfy this requirement, a student's conduct must "'create[ ] a reasonable suspicion that a particular regulation or law has been violated, with the search serving to produce evidence of the violation.'" *Id.* (quoting *Cornfield v. Consolidated High Sch. Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir.1993)). We review a finding of reasonable suspicion de novo, giving "due weight" to the inferences the district court drew from the facts. *See Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

At the outset, our inquiry into whether the Corporation had a reasonable suspicion of drug use seems a bit of a paradox. The deposition testimony of Philip Nikirk, Dean of Students at Anderson High School, reveals that the Corporation required Willis to submit to a urine screen solely because he had been in a fight, which triggered suspension and a mandatory drug test:

Q. Now, did you observe [Willis] after the fight that gave rise to the initial suspension?

A. The teacher brought both of the students down to my office, yes.

Q. Did you observe anything that would make you think he was impaired or under the influence of drugs or alcohol?

A. I had nothing at that time that would give me reasonable suspicion, no.

Q. So the basis for the testing was the fact that a decision was made to suspend him because of the offense of fighting; is that correct?

A. That's correct.

R. 24. Given this testimony, the Corporation's assertion that "Willis' actions established reasonable suspicion of drug or alcohol use," Appellee's Br. at 18, is problematic. The Corporation argues that, in light of the data establishing a "causal nexus" between illegal substances and violent behavior, the fight itself was enough to create reasonable suspicion that Willis was using an illegal substance. We can construe this argument in two ways. From one perspective, the Corporation seems to be contending that fighting alone gives rise to a conclusive presumption of reasonable suspicion and that the Corporation's rule incorporates this presumption. This, however, would belie the very notion of *individualized* suspicion, which is almost by definition determined on a case-by-case basis. *See, e.g., Bridgman, supra*; *Cornfield v. Consolidated High Sch. Dist. No. 230*, 991 F.2d 1316 (7th Cir.1993). Alternatively, the Corporation may be arguing that its Dean of Students was simply wrong—that *in this particular case* Willis' conduct created a reasonable suspicion of drug use. Of course, when a school official concludes that a student's conduct creates individualized suspicion of drug or alcohol use, our usual inquiry is whether that conclusion is a reasonable one. *See Bridgman*, 128 F.3d at 1149. But if the Corporation is arguing that its Dean of Students was incorrect, we would have to turn our traditional inquiry on its head and ask whether it was *unreasonable* for Dean Nikirk to conclude that Willis' actions did not create individualized suspicion of drug or alcohol use.

In light of these analytical difficulties, perhaps our discussion of the Corporation's alleged reasonable suspicion could end here. But because the Corporation argues the issue at length, we review its data to show why the "causal nexus" between fighting and illegal substance use is not strong enough to support a conclusive presumption of reasonable suspicion. Or, stated a bit differently, we review the Corporation's data to illustrate

why it was reasonable for Dean Nikirk to conclude that Willis' actions did *not* create reasonable suspicion.

The Corporation's data has two core components: the results of drug tests administered at the Corporation's two high schools, and various literature demonstrating "a causal nexus between drug and alcohol abuse and disciplinary problems in schools." Appellee's Br. at 2. With respect to the results of the Corporation's tests, during the first semester the policy was in effect, 40% of all students at Highland High School who were suspended for fighting tested positive. At Anderson High School—where Willis was a freshman—18% of all students suspended for fighting tested positive. The record does not contain information about Highland High School freshmen who were suspended for fighting, but 6% of all Highland freshmen who were screened under the policy tested positive. At Anderson High School, 27% of all freshmen tested positive, but none of the freshmen who were suspended for fighting tested positive.

The professional literature documents a relationship between fighting and the use of unlawful substances. It states, for example, that students who use illegal substances are "more than twice as likely to get into physical fights," and that "50% of users admitted initiating violence." *Aggressive and Violent Students*, R. 13. In explaining how to recognize drug and alcohol abuse, the literature instructs parents and teachers to look for children who are "defying rules and regulations" and "exhibiting abusive behavior." *Adolescent Substance Abuse: Etiology, Treatment, and Prevention*, R. 13 at 17–18. It is notable, however, that one of the texts on which the Corporation relies also lists 31 other indications of substance use—including "sleeping more than usual" and "playing parents against each other." *Id.* The text also states that a list of the possible signs of substance abuse "could be endless," and cautions that many of the indicators "are to some extent normal in many adolescents at certain times." *Id.* at 18. For this reason,

the literature explains, "[c]hanges from the norm, several behaviors going on at once, and frequency of occurrence are most revealing." *Id.* at 17–18.

As the Supreme Court has acknowledged, articulating a precise definition of "reasonable suspicion" is impossible. See *Ornelas*, 517 U.S. at 695, 116 S.Ct. 1657. But the Court has made clear that reasonable suspicion is a "commonsense, nontechnical conception[ ] that deal[s] with 'the factual and practical considerations of everyday life on which reasonable prudent men, not legal technicians, act.'" *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 231, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). With this definition in mind, we think a prudent person would reasonably conclude that while the Corporation's own statistics suggest some relationship between the use of illegal substances and fighting, the relationship is by no means conclusive. Indeed, it varies dramatically depending on how one analyzes the testing results—by school, grade or whatever. (And, even more fundamentally, since it is unknown what percentage of the Corporation's general student population uses drugs or alcohol, it is also unknown whether—at the Corporation's two high schools—students who fight are more likely than their peers to use illegal substances.) Moreover, while the professional literature reports that fighting is an indication of substance abuse, it also describes fighting as normal for adolescents and advises that a clustering of disruptive behaviors is most indicative of unlawful substance use. As far as we know, of course, Willis was involved in only a single fight. The same can probably be said about some of the other students who have been suspended for fighting. We therefore cannot find that the Corporation's data is strong enough to conclusively establish reasonable suspicion of substance abuse when a student is suspended for fighting, or that it was unreasonable for Dean Nikirk to conclude that Willis' conduct did not give rise to individualized suspicion.[2] *Cf. Bridgman*, 128

2. In its Petition for Rehearing, the Corporation has objected to our use of the word, "conclusive," which it argues changes the accepted meaning of "reasonable suspicion." As indicat-

ed at slip op. at 418, 1998 WL 569114 at *2, we have used **"conclusive"** in combination with **"presumption"** *to indicate the legal effect of the* Corporation drug testing policy in the determina-

F.3d at 1147, 1149 (illustrating that student was searched because he exhibited multiple signs of drug use); *Cornfield,* 991 F.2d at 1323 ("As the facts of this case stand, however- er, Spencer and Frye relied on a number of relatively recent incidents reported by vari- ous teachers and aides as well as their per- sonal observations, the *cumulative* effect of which is sufficient to create a reasonable suspicion that Cornfield was crotching drugs.") (emphasis added).

### B. Special Needs

The Corporation's urine screen, however, could still pass muster if it fell within a "closely guarded category of consti- tutionally permissible suspicionless searches." *Chandler,* 117 S.Ct. at 1298. These suspicionless searches are occasionally warranted by "special needs, beyond the nor- mal need for law enforcement." *Id.* at 1301 (quoting *Skinner v. Railway Labor Execu- tives' Ass'n,* 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989)). When the govern- ment alleges such a need, courts decide whether the search is reasonable by under- taking "a context-specific inquiry, examining closely the competing private and public in- terests advanced by the parties." *Id.* After engaging in such an inquiry, the district court found that the Corporation's search was constitutional. We review this conclu- sion de novo. *See United States v. Ross,* 32 F.3d 1411, 1415 (9th Cir.1994).

Willis argues that the district court should not have undertaken a special needs analysis at all. As he sees it, the analysis is inappropriate because "searches based on suspicion [are not] impracticable or impossi- ble in this context." Appellant's Br. at 13. But the Supreme Court has held that a con- text-specific inquiry is appropriate when "concerns other than crime detection ... are alleged in justification of a Fourth Amend- ment intrusion." *Chandler,* 117 S.Ct. at 1301. Here the Corporation has alleged such concerns—deterring drug use, disciplining its students and protecting the health of chil- dren. However, as *Chandler* and other Su-

preme Court precedent make clear, the prac- ticality of a suspicion-based search is far from irrelevant to our analysis.

The Supreme Court has examined suspi- cionless drug testing in four different con- texts. In *Chandler, supra,* the Court found that Georgia could not constitutionally re- quire candidates for state office to submit to a drug test. In *Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), the Court upheld random testing of student athletes. In *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), the Court ruled that it was permissi- ble to test United States Customs officers who carry firearms or hold positions directly related to drug interdiction. And in *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), the Court upheld testing for railroad employ- ees who violate safety rules or are involved in train accidents. These precedents serve as "our guides" in determining when it is rea- sonable for the government to require drug testing in the absence of individualized suspi- cion. *Chandler,* 117 S. Ct. at 1303.

All of these instructive cases strongly indi- cate that the feasibility of a suspicion-based search is a key consideration in determining whether it is reasonable for the government to implement a suspicionless regime. *See also Vernonia,* 515 U.S. at 674–75, 115 S.Ct. 2386 (O'Connor, J., dissenting) (collecting cases outside the drug testing context). And this emphasis on the practicality of a suspi- cion-based search is unsurprising, since "to be reasonable under the Fourth Amend- ment, a search must ordinarily be based on individualized suspicion of wrongdoing." *Chandler,* 117 S.Ct. at 1301. Indeed, *Skin- ner* and *Von Raab*—the first cases address- ing suspicionless drug testing—included in their articulation of the special needs analy- sis the requirement that a suspicion-based approach be unworkable. *Skinner,* for ex- ample, instructs courts to "balance the gov- ernmental and privacy interests *to assess the practicality of the [individualized suspicion]*

tion of individualized suspicion. Thus, the policy creates a "conclusive" or "irrebuttable" pre- sumption of reasonable suspicion as opposed to a

rebuttable one. The definition of reasonable sus- picion itself is not affected by these consider- ations.

requirements in the particular context." 489 U.S. at 619, 109 S.Ct. 1402 (emphasis added). In *Von Raab*, the Court stated, "[o]ur cases establish that where a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is *impractical to require a warrant or some level of individualized suspicion in the particular context*." 489 U.S. at 665–66, 109 S.Ct. 1384 (emphasis added). Then, in *Vernonia*, the Court outlined the contours of the special needs inquiry with greater specificity. *Vernonia* explained that the reasonableness of a suspicionless search depends upon the balance between (A) the nature of the individual's privacy interest and the character of the intrusion, and (B) the nature and immediacy of the government's concern, as well as the efficacy of the means for meeting that concern. *See* 515 U.S. at 654, 658, 660, 115 S.Ct. 2386. Under the *Vernonia* formulation, courts consider the feasibility of a suspicion-based search when assessing the efficacy of the government's policy. *See id.* at 663, 115 S.Ct. 2386 ("As to the efficacy of this means for addressing the problem .... [individualized suspicion] entails substantial difficulties—if it is indeed practicable at all."); *see also Chandler*, 117 S.Ct. at 1304.

As a practical matter, it may be that when a suspicion-based search is workable, the needs of the government will never be strong enough to outweigh the privacy interests of the individual. Or, stated slightly differently, perhaps if a suspicion-based search is feasible, the government will have failed to show a special need that is "important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion." *Id.* 117 S.Ct. at 1303. And maybe this is all Willis is driving at when he argues that we should not undertake a special needs analysis

because "searches based on suspicion [are not] impracticable or impossible in this context." Appellant's Br. at 13. For Willis' central point is that, in this particular context, the Corporation must have reasonable suspicion before demanding that he submit to a drug test. And if we find that the Corporation's "special need" is not strong enough to outweigh Willis' privacy interests, we will have arrived at the point that Willis is trying to make—in the absence of reasonable suspicion, the Corporation is precluded from searching him. But we will not short-circuit the special needs inquiry by focusing *solely* on the practicality of the search. Instead, we examine each of the factors set forth in *Vernonia*.[3]

▮ In some ways, the nature of the privacy interest at issue here is similar to that in *Vernonia* and in *Todd v. Rush County Schools*, 133 F.3d 984 (7th Cir.1998), where we upheld the random testing of all students involved in extracurricular activities. While public school students do not "shed their constitutional rights ... at the schoolhouse gate," *Tinker v. Des Moines Indep. Sch. Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), Fourth Amendment rights nonetheless "are different in public schools than elsewhere," *Vernonia*, 515 U.S. at 656, 115 S.Ct. 2386. This stems in part from "the schools' custodial and tutelary responsibility for children," and—with respect to drug testing in particular—the fact that public school students often undergo mandated medical procedures such as vaccinations and scoliosis screening. *Id.* Like the *Vernonia* athletes, then, Willis and the other children attending the Corporation's high schools enjoy a "lesser expectation of privacy than members of the population generally." *See id.* at 657, 115 S.Ct. 2386 (quoting *T.L.O.*, 469 U.S. at 348, 105 S.Ct. 733 (Powell, J., concurring)).

But the privacy interest at issue here differs from that in *Vernonia* in at least two significant respects. First, given the "ele-

3. With respect to the character of the government's intrusion, Willis has not objected to the process by which the urine screen is administered, nor does the record contain any information on this point. We therefore presume that the Corporation's process is similar to the one in

*Vernonia*, which the Court deemed a "not significant" invasion of privacy. 515 U.S. at 660, 115 S.Ct. 2386. Accordingly, our inquiry concentrates on the individual's privacy interest, the nature and immediacy of the government's concern, and the efficacy of the testing policy.

ment of 'communal undress' inherent in athletic participation," athletes have an even lesser privacy expectation than the general student population. *Id.* (quoting *Schaill*, 864 F.2d at 1318). Of course, *Todd* made no mention of the locker room, and apparently did not consider "communal undress" to be a significant distinction between athletics and other extracurricular activities. *But see Trinidad Sch. Dist. No. 1 v. Lopez*, No. 97SC124, 1998 WL 373305 (Colo. June 29, 1998) (holding that suspicionless drug testing of all secondary school students involved in extracurriculars violates the Fourth Amendment). However, *Todd* did emphasize the second factor that distinguishes the privacy interest at issue here from the one in *Vernonia*—a testing policy for students in athletics or other extracurricular activities "applies only to students who have voluntarily chosen to participate in an activity." *Todd*, 133 F.3d at 986; *see Vernonia*, 515 U.S. at 658, 115 S.Ct. 2386.

Despite the Corporation's strained arguments to the contrary, Willis cannot be described as voluntarily engaging in misconduct—at least not as the term "voluntary" is used in *Vernonia*. There the Court noted a series of steps that an athlete had to take in order to compete—submitting to a preseason physical, maintaining a minimum grade point average, attending practices, etc. *See* 515 U.S. at 657, 115 S.Ct. 2386. This course of conduct presumably indicates forethought and at least some appreciation of all that participation in an extracurricular activity entails. We doubt that this degree of consideration—and certainly this appreciation of the consequences—characterizes the typical fight between fifteen-year-olds. In addition, in *Vernonia* and *Todd* drug testing could be construed as part of the "bargain" a student strikes in exchange for the privilege of participating in favored activities. In the present case, however, such testing is a consequence of unauthorized participation in disfavored activities.

Moreover, the policy cannot be described as "giving students control, through their behavior, over the likelihood that they [will] be tested." *Id.* at 685–86, 115 S.Ct. 2386 (O'Connor, J., dissenting) (considering the

reasonableness of a policy that focused on students who violated "published school rules against severe disruption in class and around campus"); *see Skinner*, 489 U.S. at 611, 109 S.Ct. 1402 (upholding a scheme under which train operators must submit to a urine test when they engage in excessive speeding or violate similar rules). At oral argument we learned that the Corporation does not rely on the proverbial "who started it" in deciding when to suspend after a fight, but instead suspends all who participated in the fight. In other words, the Corporation suspends the victim of the instigator, provided that the victim fights back. Certainly the decision to return a punch—often made in less time than it takes the aggressor to deliver the second blow—cannot be analogized to the sort of measured conduct or degree of control discussed in *Vernonia*. In sum, while those subject to the Corporation's drug testing policy have a lessened privacy interest simply because they are children attending school, their privacy interest is nonetheless stronger than that of the students discussed in *Vernonia* and *Todd*.

At the outset of our inquiry into the Corporation's need, we must confess to the almost overwhelming temptation, given the effect that drugs have on the children who use them and on the educational process in general, to make the importance of deterring drug use among schoolchildren the beginning and end of our analysis. *See Todd*, 133 F.3d at 986 ("As defendants explained ... their program was designed to deter drug use and not catch and punish users.... Certainly successful extracurricular activities require healthy students."). But we cannot focus solely on the benefits of deterrence. If this were the only relevant consideration, *Vernonia* might as well have sanctioned blanket testing of all children in public schools. And this it did not do. *See Vernonia*, 515 U.S. at 666, 115 S.Ct. 2386 (Ginsburg, J., concurring) ("I comprehend the Court's opinion as reserving the question whether the District ... constitutionally could impose routine testing not only on those seeking to engage with others in team sports, but on all students required to attend school.").

This tips up the related need to carefully examine the group to which the testing policy applies. For one insidious means toward blanket testing is to divide students into several broad categories ("extracurricular-ites," troublemakers, etc.) and then sanction drug testing on a category-by-category basis. Eventually all but the most withdrawn and uninvolved students will fall within a category that is subject to testing. (And the very data relied on by the Corporation reports a relationship between "isolating self" and drug and alcohol use, *see Adolescent Substance Abuse*, R. 13 at 18, so perhaps we should not be so quick to assume that a school district will not try to clear a path for testing these non-participating students as well.) Our point is that simply invoking the importance of deterrence is insufficient. Instead it is necessary to closely examine both the nature of the government's concern and the efficacy of the policy *in this particular case*, to ensure that the Corporation's action fits "within the closely guarded category of constitutionally permissible suspicionless searches." *Chandler*, 117 S.Ct. at 1298.

Having said all this, however, we believe there is little distinction between the nature and immediacy of the Corporation's concern and that of the school districts in *Vernonia* and *Todd*. Both cases involve the perennial need to reduce drug use among children. And while the record does not suggest that students who committed disciplinary infractions "were the leaders of the drug culture" or role models—as the athletes in *Vernonia* were, *see* 515 U.S. at 649, 663, 115 S.Ct. 2386—the Corporation nonetheless crafted its policy to target the narrow group of students that it perceived as most at risk for substance abuse. *See id.* at 661–62, 115 S.Ct. 2386; *id.* at 685, 115 S.Ct. 2386 (O'Connor, J., dissenting) (noting a policy that applied to students who committed severe disciplinary infractions would subject dramatically fewer students to testing than a policy that tested all student athletes). Similarly, while the immediacy of the Corporation's concern does not rise to the level of that in *Vernonia*— where "a large segment of the student body ... was in a state of rebellion" and "disciplinary actions had reached 'epidemic proportions,'" *see id.* at 662–63, 115 S.Ct. 2386

(citations omitted)—administrators at the Corporation's two high schools were trying to address what they perceived as an increasing drug and alcohol problem. We therefore cannot conclude that the nature and immediacy of the Corporation's concern is meaningfully less than that of the Vernonia School District.

However, as our previous discussion alluded, there is sharp contrast between the efficacy of the policy in *Vernonia* (and, by logical extension, in *Todd*) and the efficacy of the policy in this case. In *Vernonia*, a system based solely on individualized suspicion "entail[ed] substantial difficulties—if it [were] indeed practicable at all." 515 U.S. at 663, 115 S.Ct. 2386. At oral argument, we pushed the Corporation's counsel to explain why individualized suspicion was impracticable in this context. His primary response was that "the school board felt [individualized suspicion] works sometimes, but it's obviously not working in the Anderson schools because we still have a problem." But our determination of whether the Corporation has demonstrated a special need cannot be controlled by the fact that a suspicionless regime casts a wider net than a suspicion-based regime. A suspicion-based approach might never round up as many wrongdoers as a suspicionless system, since some students may be particularly adept at hiding the signs of their drug and alcohol use. Indeed, one of the most effective means of preventing substance abuse among children may be to require them to provide a urine sample each time they pass through the schoolhouse gate. But, as we have tried to emphasize, the Supreme Court has not sanctioned blanket testing. Nor has it renounced the proposition that the Fourth Amendment normally requires individualized suspicion. *See Chandler*, 117 S.Ct. at 1303. And it is hard to imagine a scenario in which the Corporation's school officials are better-situated to make a determination of individualized suspicion than in the wake of student misconduct that warrants a three-day suspension.

 Under Indiana law, unless the "misconduct requires immediate removal of a student," a child cannot be suspended until he or she first meets with the school principal or

similar official. *See* Ind.Code § 20–8.1–5.1–12. At Anderson High School, it is apparently commonplace for rule-breakers to meet with the Dean of Students. This meeting—mandated by state law—provides an opportunity for the designated school official to observe the child and determine whether there is a reasonable suspicion of substance abuse. Indeed, one of the ironies of this case is that even as the Corporation endeavors to show a special need that warrants abandonment of the Fourth Amendment's usual requirements, the record shows that the Dean of Students at Anderson High School evaluated Willis without any apparent difficulty and determined that "nothing at that time [created] reasonable suspicion."

The scenario prescribed by state law—an *individual* meeting between the wrongdoer and a high-ranking agent of the school district—distinguishes this case from those in which the Supreme Court has permitted suspicionless drug testing. In *Von Raab, Skinner* and *Vernonia,* the Supreme Court "pointed to sound reasons why [an individualized suspicion] standard would be unworkable under the unusual circumstances presented." *Pierce v. Smith,* 117 F.3d 866, 886 (5th Cir.1997) (Dennis, J., dissenting). In *Von Raab,* for example, it was impractical to require individualized suspicion before testing customs officials because it was "not feasible to subject [these] employees and their work product to the kind of day-to-day scrutiny that is the norm in more traditional office environments." *Von Raab,* 489 U.S. at 674, 109 S.Ct. 1384. In *Skinner,* individualized suspicion was impractical because "the scene of a serious rail accident is chaotic." *Skinner,* 489 U.S. at 631, 109 S.Ct. 1402. And although *Skinner* upheld suspicionless testing after an employee violated certain safety rules—regardless of whether an accident had occurred—the Federal Railroad Administration had been relying on the wrongdoer's co-workers and supervisors to report signs of drug and alcohol use. Because some of these co-workers may have been involved in "pockets of drinking and drug use involving multiple crew members," they were unlikely to provide information to the Administration. *Id.* at 608, 109 S.Ct. 1402 (internal quotation marks omitted). Ac-

cordingly, it was difficult for the Administration to detect more than a small number of the substance abusers. *See id.* Finally, with respect to *Vernonia* (and *Todd*), it was of course infeasible for the Dean of Students or a similar disciplinary figure to meet individually with all the students participating in athletics (or other extracurricular activities).

While our striking down the Corporation's policy may make the job of the Dean of Students or similar school officials slightly more difficult, it is not akin to adding "to the ever-expanding diversionary duties of schoolteachers the new function of spotting and bringing to account drug abuse, a task for which they are ill prepared, and which is not readily compatible with their vocation." *Vernonia,* 515 U.S. at 663, 115 S.Ct. 2386. At oral argument, the Corporation's counsel described the Dean of Students as already having the "obligation" to identify and investigate drug and alcohol use. And as Dean Nikirk's testimony indicates, the designated disciplinarians are already fulfilling this obligation. Moreover, it is hard to believe that Deans of Students would have any difficulty justifying a finding of reasonable suspicion in fighting cases. Therefore the imposition of a suspicionless policy seems to serve primarily demonstrative or symbolic purposes. *See Chandler,* 117 S.Ct. at 1305. Finally, *Vernonia's* concern that a drug testing regime based on individualized suspicion would transform the process into a "badge of shame" is largely superfluous here, since under the Corporation's current policy, testing is put into motion when a student engages in misconduct. In sum, we are convinced that the Corporation's policy addresses a concern that can be tackled by means of a traditional, suspicion-based approach. *Cf. Chandler,* 117 S.Ct. at 1304 (explaining that the government has "offered no reason why ordinary law enforcement methods would not suffice to apprehend ... addicted individuals").

As the foregoing analysis indicates, while the nature and immediacy of the government's concern is analogous to that in *Vernonia,* both the efficacy of the policy and the privacy interest of the individual are different. Particularly because the Corporation has not demonstrated that a suspicion-based

system would be unsuitable, in fact would not be highly suitable, we think the balance of our "context-specific inquiry" tips in favor of Willis. We recognize, however, that we may in theory be precluding suspicionless drug testing for students who are far less sympathetic than those in *Vernonia* or *Todd*. But, as we have tried to make clear, it is necessary to establish some boundaries so as not to sanction "routine drug testing ... on all students required to attend school." *Vernonia*, 515 U.S. at 666, 115 S.Ct. 2386 (Ginsburg, J., concurring). Because a suspicion-based system could easily address the Corporation's concern, the line that we have drawn today strikes us as reasonable.

REVERSED.