Rosa J. LINKE, Reena M. Linke (By their next friends and parents), Scott L. Linke and Noreen L. Linke, Appellants–Plaintiffs,

v.

NORTHWESTERN SCHOOL CORP., Appellee–Defendant.

No. 34A05–9910–CV–467.

Court of Appeals of Indiana.

Aug. 21, 2000.

Kenneth J. Falk, E. Paige Freitag, Indiana Civil Liberties Union, Indianapolis, Indiana, Attorneys for Appellant.

Julia Blackwell Gelinas, John H. Daerr, Locke Reynolds, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

SULLIVAN, Judge

Appellants, Rosa J. Linke and Reena M. Linke (collectively "Linkes"), through their parents, appeal the trial court's denial of summary judgment.

We reverse and remand.

The facts reveal that the Linkes were both students at Northwestern School Corporation (NSC) when this suit was filed. Rosa was a junior and Reena was a freshman at Northwestern High School. At the time of the suit, Rosa participated in track, National Honor Society, Students Against Drunk Driving, the Prom Committee, and Academic Competition. Rosa also had her driver's license, and wanted to drive to school. Reena participated in choir, track, Academic Competition, Sunshine Society, and Fellowship of Christian Athletes.

NSC adopted a drug testing policy, the Northwestern School Corporation Extracurricular Activities and Student Driver Drug Policy, which became effective on January 12, 1999. NSC's primary objective in adopting its policy seemed to be protecting the health and safety of its students. NSC was also concerned about students representing the school system in the community. Although drug and alcohol use had increased among NSC students according to a 1995 Indiana Prevention and Resource Center (IPRC) study, the statistics did not dramatically alarm NSC officials to conclude that drug use was particularly affecting school discipline at NSC. However, a committee composed of parents and school employees was formed after two NSC students died from a drug overdose, and a recent NSC graduate was killed in a car accident involving the use of inhalants. NSC was more concerned about preventing future tragedies than combating an existing drug problem.

The NSC's policy applies to all NSC students in grades seven through twelve. The policy provides that students wishing to participate in athletics, certain extracurricular activities,[1] or certain co-curricular

1. The extracurricular activities included within the policy are academic teams, drama, Future Farmers of America (FFA), National Honor Society, student government, and Students Against Drunk Driving (SADD).

activities[2] must consent to random drug testing. Also, if students wish to drive to school, they must subject themselves to the testing. All students who wish to participate in the activities covered by the policy must sign a consent form agreeing to the random drug testing. If the student is involved in a co-curricular activity and he or she does not consent to a drug test, then the student may not participate in performances or competitions which take place outside of normal school hours, but still will receive class credit.

The drug testing is accomplished through a urinalysis. After a student is randomly chosen for testing, the student is escorted by the principal of the school to a trailer containing restroom facilities. The student then gives the urine sample, which is taken to a laboratory where it is tested for the substances prohibited by the policy.[3] If the test is positive, the sample is re-tested, and after a second positive reading, the result is sent to the school. A conference is then held with the student and his or her parents, and the student is given an opportunity to explain the positive result. While the positive result does not become a part of the student's academic record, the penalties depend upon the circumstances. For example, the student may be banned from participating in extracurricular activities or from driving to school for a specified amount of time. A student may be re-tested after sufficient time has elapsed for the substance to be eliminated from the student's body. If the re-test is negative, then the student may return to the activity or drive to school. If the re-test is positive, then the school may conduct subsequent tests throughout the rest of the school year.

The Linkes and their parents believe that NSC's drug testing policy violates their constitutional rights. They feel the policy invades their personal privacy and are uncomfortable about the possibility of providing a urine sample for school officials. The Linkes both signed a consent form but have objected to the policy.

On February 26, 1999, the Linkes, along with their parents, filed a complaint for injunctive and declaratory relief. On June 10, 1999, the Linkes filed a Motion for Summary Judgment asserting that the drug policy invaded their privacy rights. NSC filed a response on August 2, 1999. On September 13, 1999, the trial court denied the Linkes' motion for summary judgment and issued findings of fact and conclusions of law. The court denied the Linkes' requests for injunctive and declaratory relief, and entered a final judgment in favor of NSC. The trial court concluded that NSC's drug testing policy was reasonable under the Fourth Amendment of the United States Constitution and Article 1, Section 11 of the Indiana Constitution. The trial court also concluded that NSC's drug policy did not violate Article 1, Section 23 of the Indiana Constitution.

Upon appeal, the Linkes maintain that NSC's drug testing policy is unconstitutional. Before examining the Linkes' argument which is based upon the Indiana Constitution, a discussion of the application of the Fourth Amendment to searches in schools and drug testing helps place the issue in perspective.

The Fourth Amendment provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Courts have traditionally interpreted the Fourth Amendment to require that searches and seizures be supported by

---

2. Co-curricular activities include those activities for which students receive class credit. The co-curricular activities named in the policy are musical activities including band, choir, and solo-ensemble contests.

3. The substances included in the policy are alcohol, amphetamines, anabolic steroids, barbiturates, benzodiazepines, cocaine metabolites, LSD, marijuana metabolites, methadone, methaqualone, nicotine, opiates, phencyclidine, propoxyphene, and other specified drugs.

probable cause and a warrant. Over time, however, courts have carved out exceptions to these general requirements.[4]

██ One such exception has been created through the development of what has become denominated as the "special needs" analysis. *Griffin v. Wisconsin* (1987) 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709. This analysis is employed when the government demonstrates a substantial interest beyond normal law enforcement activities which make the search or seizure necessary and requiring a warrant and probable cause would frustrate this interest. The United States Supreme Court in *New Jersey v. T.L.O.* (1985) 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 applied the balancing analysis in the public school context when a student's purse was searched by school officials after she was discovered smoking at school. In that case, the Court held that a search unsupported by a warrant was constitutional because requiring a warrant "would unduly interfere with the maintenance of the swift and informal disciplinary procedures needed in the schools." *Id.* at 340, 105 S.Ct. 733. The Court also adjusted the level of suspicion required in order to conduct a search. It concluded "that the accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause...." *Id.* at 341, 105 S.Ct. 733. Instead, the Court, noting other situations in which courts have upheld searches based upon suspicions which were reasonable but did not amount to probable cause, concluded that the legality of the search of a student should depend upon reasonableness. *Id.* The Court did not specifically decide whether its reasoning could be extended to justify school authorities in conducting searches not supported by individualized suspicion. *Id.* at 347 n. 8, 105 S.Ct. 733.

██ Later, when considering the legality of drug testing in different contexts, the United States Supreme Court moved away from the requirement of individualized suspicion. In *Skinner v. Railway Labor Executives' Ass'n* (1989) 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639, suspicionless searches were upheld where random drug tests were conducted upon railroad personnel involved in train accidents. Similarly, in *National Treasury Employees Union v. Von Raab* (1989) 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685, the Court recognized that federal customs agents who carry arms and are involved in drug interdiction could be subject to random drug testing. In both of these cases, the Court recognized that state-compelled collection and testing of urine constitutes a search for purposes of the Fourth Amendment. *Skinner, supra* at 617–18, 109 S.Ct. 1402; *Von Raab, supra* at 665, 109 S.Ct. 1384. The Court in *Skinner* focused upon the fact that drugs and alcohol had been a continuing problem with railroad personnel, and the government had a special need to protect public safety. *Id.* at 620, 109 S.Ct. 1402. Similarly, the Court in *Von Raab* held that customs agents directly involved in drug interdiction could not safely perform their jobs if under the influence of drugs. *Id.* at 668–70, 109 S.Ct. 1384. Both cases held that, in limited circumstances, where the privacy interests implicated are minimal and the governmental interest would be jeopardized by requiring individualized suspicion, a search may be reasonable even if not based upon individualized suspicion. *Skinner, supra* at 624, 109 S.Ct. 1402; *Von Raab, supra* at 679, 109 S.Ct. 1384.

In 1995, the United States Supreme Court addressed the issue of random drug testing in the public school context. The Court upheld a school policy requiring student athletes to submit to random drug tests in *Vernonia Sch. Dist. 47J v. Acton* (1995) 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564. The policy in *Vernonia* was adopted after other efforts failed to eradicate a drug problem in the school. School

---

**4.** A few of these exceptions include searches incident to arrest, inventory searches, the plain view doctrine, and consent searches.

officials discovered that student athletes were the center of the drug problem.

Justice Scalia, writing for the majority, balanced the nature of the privacy interest, the character of the intrusion, and the nature and immediacy of the governmental concern and the efficacy of this means for meeting it, to arrive at the conclusion that the drug testing policy was reasonable. *Id.* at 664–65, 115 S.Ct. 2386. The decision stated that although students "do not 'shed their constitutional rights ... at the schoolhouse gate,'" students, and student athletes especially, have a diminished privacy interest compared with members of the general population. *Id.* at 655–56, 115 S.Ct. 2386 (quoting *Tinker v. Des Moines Indep. Community Sch. Dist.* (1969) 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731). The majority reasoned that student athletes voluntarily give up their privacy when they choose to participate in sports, as they must submit to a physical exam, sign insurance waivers, comply with the sport's rules of conduct, and change in communal locker rooms. *Vernonia, supra* at 657, 115 S.Ct. 2386.

The majority also concluded that the degree of intrusion was not severe because the urine samples were collected in a setting similar to that of a public restroom, the urinalysis was tested for drugs and not other conditions, and the results were disclosed only to school personnel who have a need to know and not to law enforcement officials. *Id.* at 658, 115 S.Ct. 2386. The decision expressed that the concern of student drug use was compelling and immediate, and if not remedied, would disrupt the educational process. *Id.* at 661–62, 115 S.Ct. 2386. The majority also spoke to the efficacy of the drug testing policy in addressing the school's drug problem. *Id.* at 663, 115 S.Ct. 2386. The Court agreed that if the drug problem is caused by the athletes using drugs, it makes sense to ensure that athletes are drug free. *Id.*

However, Justice Scalia was unable to persuade all of his colleagues. Justice O'Connor authored a dissent which two other justices joined. Justice O'Connor, citing *T.L.O., supra,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720, maintained that the level of suspicion in the school context is "objectively reasonable suspicion." *Vernonia, supra,* 515 U.S. at 677, 115 S.Ct. 2386. The dissent warned that the special needs analysis had been extended too far with this case: "the [majority] treats a suspicion-based regime as if it were just any run-of-the-mill, less intrusive alternative—that is, an alternative that officials may bypass if the lesser intrusion, in their reasonable estimation, is outweighed by policy concerns unrelated to practicability." *Id.* at 676, 115 S.Ct. 2386. Justice O'Connor continued her criticism by stating that the individualized suspicion requirement should not be discarded so lightly and that intrusive blanket searches like this one "are not a part of any traditional school function of which I am aware." *Id.* at 682, 115 S.Ct. 2386. Justice O'Connor further stated that even if she agreed that the testing was justified in this setting, she would disagree with the conclusions that there was a drug crisis in the grade school in which the plaintiffs' son was a student and that athletes should have been the test group chosen to eradicate the problem where it may have existed. *Id.* at 684–85, 115 S.Ct. 2386. Justice O'Connor ended her dissent with the thought that "the greatest threats to our constitutional freedoms come in times of crisis." *Id.* at 686, 115 S.Ct. 2386.

From the inception of the special needs analysis, it would appear that the United States Supreme Court has regularly reviewed governmental searches and seizures subject to the special needs analysis and has afforded wide approval to such searches. It seems that the drug testing policies like the ones reviewed in *Skinner, Von Raab,* and *Vernonia* passed constitutional scrutiny easily until the court decided *Chandler v. Miller* (1997) 520 U.S. 305, 117 S.Ct. 1295, 137 L.Ed.2d 513. In *Chandler,* the Court held that candidates running for a state political office in Georgia could not be subject to a drug test in order to qualify for the position. The Court reasoned that the requirement did not fit within the "closely guarded category of constitutionally permissible suspicionless searches." *Id.* at 309, 117 S.Ct. 1295.

Further, no showing was made of an immediate danger which would demand a departure from the Fourth Amendment's preclusion to suspicionless searches. *Id.* at 318–319, 117 S.Ct. 1295. While *Chandler* refused to uphold the drug testing policy, it did not criticize the special needs analysis used in *Vernonia.* Instead, the Court merely refused to extend the special needs analysis when no reason had been given to justify departing from the requirement of individualized suspicion.

The cases utilizing the special needs analysis have drawn extensive criticism because of the judicial "line drawing" that is required to approve or disapprove drug testing policies. The United States Supreme Court has yet to provide guidance as to what exactly a "special need" is and how the individual privacy and governmental interests involved should be weighed. *See* Robert D. Dodson, *Ten Years of Randomized Jurisprudence: Amending the Special Needs Doctrine* 51 S.C. L.Rev. 258, 287 (2000). Further, the drug testing policies reviewed under the special needs analysis seem to gain "a judicial rubber stamp of approval" even though the justification for the testing is not always clear and the ineffectiveness of a suspicion based testing regime has not been established. *Id.* at 276. The *Vernonia* decision has been said to "raise as many questions about school drug testing schemes as it answered." Nancy J. Flatt–Moore, *Public Schools and Urinalysis: Assessing the Validity of Indiana Public Schools' Student Drug Testing Policies After Vernonia,* 1998 BYU Educ. & L.J. 239, 252 (1998).

Despite the criticism of the special needs analysis, an explosion of drug testing policies has occurred in public schools across the country. Flatt–Moore, *supra* at 254. Indiana schools have been at the forefront of the debate.[5] The drug policies initiated by Indiana schools also have been the subject of scholarly publications. Flatt–Moore, *supra* at 256 (noting that in the 1996–97 school year alone, seven Indiana school districts had adopted drug testing policies).

For example, in *Todd v. Rush County Sch.* (1998) 7th Cir., 133 F.3d 984, *cert. denied* (1998) 525 U.S. 824, 119 S.Ct. 68, 142 L.Ed.2d 53, the Seventh Circuit held that an Indiana school's policy of randomly testing those wishing to participate in extracurricular activities did not violate the Fourth Amendment. The court found the reasons for drug testing athletes in *Vernonia* also existed in the *Todd* case for testing those involved in extracurricular activities. *Id.* at 986. The school was attempting to fight increased drug and alcohol use. The court held that extracurricular activities, like athletics, are a privilege and cited not only safety concerns, but also the fact that those participating in extracurricular activities take leadership roles in the community. *Id.*

In contrast, the Seventh Circuit decided another case involving an Indiana school's drug testing policy differently later in the same year. The court struck down a policy which required students, suspended for fighting, to submit to a drug test in *Willis v. Anderson Community Sch. Corp.* (1998) 7th Cir., 158 F.3d 415, *cert. denied* (1999) 526 U.S. 1019, 119 S.Ct. 1254, 143 L.Ed.2d 351. The panel unanimously concluded that there was an insufficient causal nexus between the use of illegal substances and violent behavior to create reasonable suspicion. *Id.* at 418–19. Further, the court held that suspicionless searches were not justified. *Id.* at 423.[6] The court distinguished *Vernonia* by characterizing the diminished privacy interest due to "communal undress" in the locker room as unique to athletes. *Id.* at 421–22. Also, the court held that unlike *Vernonia,* this policy did not subject students to testing only if they had "voluntarily" chosen to participate in an activity. *Id.* at 422. The court found that the school had failed to prove how a system of individualized suspi-

---

**5.** *See Schaill v. Tippecanoe County Sch. Corp.* (1988) 7th Cir., 864 F.2d 1309; *Todd v. Rush County Sch.* (1998) 7th Cir., 133 F.3d 984, *cert. denied* (1998) 525 U.S. 824, 119 S.Ct. 68, 142 L.Ed.2d 53; *Willis v. Anderson Community Sch. Corp.* (1998) 7th Cir., 158 F.3d 415, *cert. denied* (1999) 526 U.S. 1019, 119 S.Ct. 1254, 143 L.Ed.2d 351; *Joy v. Penn–Harris–Madison Sch. Corp.* (2000) 7th Cir., 212 F.3d 1052.

**6.** Interestingly, the author of the opinion in *Todd, supra,* concurred in the *Willis* decision.

cion would be impracticable. *Id.* at 423.

More recently, the Seventh Circuit spoke again on the issue of suspicionless drug testing in Indiana schools. Although the court in *Joy v. Penn–Harris–Madison Sch. Corp.* (2000) 7th Cir., 212 F.3d 1052, 1063, stated that it would rather not uphold the school's drug testing policy for students participating in extracurricular activities or driving to school pursuant to *Vernonia* and *Chandler,* it was compelled to adhere to *Todd,* because of the doctrines of stare decisis.[7] The court cautioned against embarking upon a "slippery slope" and against reading *Todd* too broadly because schools seem to be testing the limits of recent case law to reach their goal of subjecting all students to suspicionless drug testing. *Id.* at 1066.[8]

*Todd, Willis,* and *Joy* are representative of how Indiana school drug policies are analyzed when constitutional challenges are made upon federal grounds. However, we must now decide if NSC's particular drug testing policy comports with the Indiana Constitution. The Linkes' challenge to NSC's policy is based upon Article 1, Section 11 of the Indiana Constitution which states "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

■ The Indiana Supreme Court has explained that when examining constitutional issues, claims based upon the Indiana Constitution should be analyzed separately from those based upon their federal counterpart in the United States Constitution. *See Ratliff v. Cohn* (1998) Ind., 693 N.E.2d 530, *reh'g denied; Boehm v. Town of St. John* (1996) Ind., 675 N.E.2d 318; *see also* Randall T. Shepard, *Second Wind for the Indiana Bill of Rights,* 22 IND. L.REV. 575 (1989).

■ Questions arising under the Indiana Constitution should be resolved by "examining the language of the text in the context of the history surrounding its drafting and ratification, the purpose and structure of our constitution, and case law interpreting the specific provisions." *Indiana Gaming Comm'n v. Moseley* (1994) Ind., 643 N.E.2d 296, 298. When construing the constitution, "'a court should look to the history of the times, and examine the state of things existing when the constitution or any part thereof was framed and adopted, to ascertain the old law, the mischief, and the remedy.'" *Bayh v. Sonnenburg* (1991) Ind., 573 N.E.2d 398, 412, *cert. denied* (1992) 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 415 (quoting *State v. Gibson* (1871) 36 Ind. 389, 391, 1871 WL 5021). "Because the intent of the framers is paramount in determining the meaning of the provision," we should "consider the purpose which induced the adoption" in order "to ascertain what the particular constitutional provision was designed to prevent." *Boehm, supra,* 675 N.E.2d at 321 (citations omitted).

■ The Indiana Supreme Court has offered some guidance in determining whether a provision in the Indiana Constitution "demands more" protection than its companion provision in the United States Constitution. *Ajabu v. State* (1998) Ind. App., 693 N.E.2d 921, 929. The court advised that Indiana case law construing the Indiana provision prior to the date of incorporation of the U.S. Constitution's provision is "'most helpful' in determining whether the Indiana Constitution demands more than its federal counterpart." *Id.* The Court also noted that "[e]ven where an Indiana constitutional provision is sub-

---

7. While the court upheld the drug and alcohol testing, it did not approve of nicotine testing for those wishing to drive to school. *Id.*

8. The author of the unanimous opinion in *Joy* concurred in the *Willis* decision and expressed the view that *Willis* "reaffirmed the basic principles in *Todd.*" 212 F.3d at 1066. This may be subject to some question in that *Todd* clearly emphasized the special needs interest of the school while *Willis* focused heavily upon the preference for individualized suspicion.

stantially textually coextensive with that from another jurisdiction ... we may part company with the interpretation of the Supreme Court of the United States or any other court based on the text, history, and decisional law elaborating the Indiana constitutional right." *Id.*

Two Indiana Supreme Court cases, considering the case law prior to incorporation, analyzed the history of Article 1, Section 11. *See Moran v. State* (1994) Ind., 644 N.E.2d 536, *reh'g denied; Peterson v. State* (1996) Ind., 674 N.E.2d 528, *cert. denied* (1999) 525 U.S. 1108, 119 S.Ct. 877, 142 L.Ed.2d 777. *Moran, supra* at 539, held that an identical provision to Section 11 appeared as Section 8 in the 1816 Indiana Constitution. The provision was added without significant debate. *Id.* The Court concluded that the intent of the framers was similar to that of the framers of the United States Constitution. *Id.* The intent was to protect against abuses of police power similar to those experienced in colonial times. *Id.*

When considering Article 1, Section 11 independently, there is support for the proposition that it provides greater protection than the Fourth Amendment. *Moran, supra,* 644 N.E.2d at 538, and *Peterson, supra,* 674 N.E.2d at 533, recognize that Article 1, Section 11 provides a separate prohibition against unreasonable searches and seizures, and challenges made under Article 1, Section 11 should be analyzed under an independent reasonableness standard. *Moran* noted that because there is "a primary and overarching mandate for protections from unreasonable searches and seizures, the reasonableness of the official behavior must always be the focus of our state constitutional analysis." *Id.* at 539.

■ There are no Indiana appellate decisions on the subject of random drug tests in the school context. However, as noted, when reviewing a search, our standard of review focuses upon the reasonableness of the official behavior. *Moran, supra,* 644 N.E.2d at 539. The purpose of Article 1, Section 11 is to protect the "areas of life that Hoosiers regard as pri-

vate." *Id.* at 540. The Indiana Supreme Court has stated that Section 11 must be given a liberal construction to prevent unreasonable searches and seizures. *Id.* Therefore, implicit in Section 11 is a general requirement of individualized suspicion at least with regard to school children. The framers of the Indiana Constitution intended to protect the people from abuses of police power. We see no reason to depart from requiring individualized suspicion to protect against the abuses associated with blanket suspicionless searches of school children.

The framers of the United States Constitution had the same concern about abuse of police power. Unfortunately, federal law in the area of drug testing has strayed from the intent of our framers. Justice O'Connor's dissent in *Vernonia* recognizes this problem, as she maintains that schools must comport with the Fourth Amendment's requirement of individualized suspicion. *Vernonia, supra,* 515 U.S. at 684, 115 S.Ct. 2386. We share Justice O'Connor's concern that the majority in that case failed to acknowledge that the Fourth Amendment framers wanted to guard against mass suspicionless searches. *Id.* at 671, 115 S.Ct. 2386.

■ The Indiana test regarding searches and seizures has always been one of reasonableness. When focusing upon the reasonableness of the official behavior in the instant case, we hold that NSC's policy of conducting suspicionless drug testing of students participating in athletics, extracurricular or co-curricular activity, or those who drive to school is unconstitutional. While we acknowledge that *Vernonia* and its successors have created justifications to extend the Fourth Amendment analysis beyond requiring individualized suspicion, we see no reason to similarly extend our analysis of Article 1, Section 11. The Indiana Supreme Court has emphasized that we should remain consistent with the framers' interpretation of the text. *See Ratliff, supra,* 693 N.E.2d at 534; *Boehm, supra,* 675 N.E.2d at 321. We are strongly convinced to remain consistent especially when in the case before us, the school does not propose a direct correlation between drug use and its need

to randomly test the majority of the students for drugs. Rather, NSC admits that its goal is to prevent future tragedies. This is an unmistakable move toward randomly testing all students.

NSC's policy places a majority of the student population into the pool from which the testing subjects are selected. Of the 550 students enrolled in Northwestern High School, 405 students have signed consent forms. Of the 405 students who have signed the consent form, approximately 300 participate in athletics, extracurricular activities, or co-curricular activities, and the remaining students have consented to the drug testing despite the fact that they are not covered by the policy. At Northwestern Middle School, 250 out of the 300 students enrolled are covered by this policy.

The Seventh Circuit in *Willis, supra,* 158 F.3d at 422, cautioned against making "the importance of deterring drug use among schoolchildren the beginning and end of our analysis." The court stated that if we have deterrence as the sole focus it would undoubtedly lead to blanket testing, which would "divide students into several broad categories ('extracurricular – ites,' troublemakers, etc.) and then sanction drug testing on a category-by-category basis. Eventually, all but the most withdrawn and uninvolved students will fall within a category that is subject to testing." *Id.* at 423.

Further, the few warnings given by Justice Scalia in *Vernonia* about extending that case's rationale have not been heeded. He wrote, "[w]e caution against the assumption that suspicionless drug testing will readily pass constitutional muster in other contexts." *Vernonia, supra,* 515 U.S. at 665, 115 S.Ct. 2386. Obviously, the suggested case-by-case approach to determine which groups of students may be randomly tested under the Fourth Amendment has failed. The Seventh Circuit has been faced with internal conflicts after *Todd* permitted suspicionless drug testing for students participating in extra-curricular activities. *See Willis, supra,* 158 F.3d at 423 (refusing to extend suspicionless testing to students suspended for fighting); *Joy, supra,* 212 F.3d at 1063 (upholding a drug testing policy for students involved in extracurricular activities because it was bound by stare decisis to follow *Todd,* even though it would have otherwise struck the policy).

We do not wish to create this same upheaval in Indiana. We hold, therefore, that NSC's policy is contrary to Article 1, Section 11 of the Indiana Constitution. Because we decide that NSC's drug testing policy is unconstitutional based upon Article 1, Section 11, we need not address the Linkes' challenge to the policy based upon Article 1, Section 23.

The judgment is reversed and remanded to the trial court with instructions to enter summary judgment for the appellants.

BAILEY, J., and VAIDIK, J., concur.

## OPINION UPON PETITION FOR REHEARING

Appellee, Northwestern School Corporation (School) files its Petition for Rehearing addressed to our opinion of August 21, 2000, as reported at 734 N.E.2d 252. In that opinion we held that a random drug testing program conducted upon students engaged in certain select activities was contrary to the provisions of Indiana Constitution, Article 1, Section 11.

It is the position of the School that our opinion conflicts with six Indiana Court of Appeals cases in that those cases "hold that in the school search context the requirements of Article I, Section 11 are coextensive with those of the Fourth Amendment and apply the Fourth Amendment framework to searches challenged under Article I, Section 11." The School is in error in its reading of those cases and we issue this opinion upon rehearing for the sole purpose of clarification.

The cases relied upon by the School are inapplicable to the random drug testing program here involved because this drug testing program wholly lacks the "general requirement of individualized suspicion" implicit in Article 1, Section 11. 734 N.E.2d at 259.

In *Berry v. State* (1990) Ind.App., 561 N.E.2d 832, only the Federal Consitution was argued but nevertheless reasonable

individualized suspicion existed. In *S.A. v. State* (1995) Ind.App., 654 N.E.2d 791, *trans. denied,* the court, applying the Indiana Constitution, held that the seizure was valid because there existed individualized suspicion of the particular student. In *D.I.R. v. State* (1997) Ind.App., 683 N.E.2d 251, both the U.S. and state constitutional prohibitions were argued but the court reversed the delinquency determination because the search was not justified upon good cause individualized suspicion. In *G.J. v. State* (1999) Ind.App., 716 N.E.2d 475, the court held that the constitutional argument had been waived but that in any event there had not been a search at all. In *D.B. v. State* (2000) Ind.App., 728 N.E.2d 179, the juvenile relied upon a Fourth Amendment argument but the search was factually based upon a good cause individualized suspicion and was therefore valid. Finally, in *C.S. v. State* (2000) Ind.App., 735 N.E.2d 273, although the student's challenge to a pat down was premised upon both the U.S. and the Indiana Constitutions, the court discussed only the Fourth Amendment and the pat down discovery of a gun was validated in light of a reasonable individualized suspicion as to the student involved.

Additionally, the School asserts that we misstated the record as to any "direct correlation between drug use and [the School's] need to randomly test the majority of the students for drugs." 734 N.E.2d at 260. Our observation in this regard was intended to acknowledge, as we must, that a Fourth Amendment federal analysis contains exceptions for situations involving "special needs," *e.g.* railroad engineers and airline pilots. Its implication was that even if a "special needs" analysis were to be made under Article 1, Section 11 of the Indiana Constitution, the School had not established the basis for such an exception in the case before us.

The School's argument in this respect focuses upon two exhibits. The first is a survey taken with regard to a totally different school corporation located in St. Joseph County. We fail to see any correlation between that study and any problem which may have been perceived as to the Northwestern School Corporation.

The second exhibit alluded to by the School is a summary of a survey taken in March and April 1995. The summary purportedly shows that drug use in the Northwestern system for four of the six grades was somewhat higher than statewide use of the same substances as reflected by a different study taken during the same time frame. The exhibit dealing with the survey of Northwestern students was introduced through the deposition testimony of the Superintendent of the School Corporation. He stated that he was only generally, rather than specifically, aware that the study contained "a statistically significant finding from the 1995 survey" relative to drug use among Northwestern 7th, 8th, 9th and 10th grade students *vis-a-vis* prevalence of use statewide. Record at 87.

This 1995 study is insufficient basis, statistical or otherwise, to demonstrate a "specific need" for a 1999 program for random drug testing of arbitrarily designated student activity groups.

In light of our disagreement with the arguments made by the School upon rehearing, we hereby reaffirm our opinion and holding as previously enunciated.