PENN–HARRIS–MADISON SCHOOL CORPORATION, Appellant–Defendant,

v.

Tianna JOY, et al., Appellees–Plaintiffs.

No. 71A04–0010–CV–437.

Court of Appeals of Indiana.

May 29, 2002.

Julia Blackwell Gelinas, Thomas E. Wheeler, II, Deborah K. Hepler, Locke Reynolds LLP, Indianapolis, IN, Attorneys for Appellant.

David R. Hoffman, Mishawaka, IN, Attorney for Appellees.

## OPINION

VAIDIK, Judge.

### Statement of the Case

Penn–Harris–Madison School Corporation (Penn) challenges the trial court's grant of summary judgment in favor of Tianna Joy, four other students, and two parents of Penn students (collectively, the Students), after the court found that Penn's drug testing program violated the Search and Seizure Clause—Article 1, Section 11 of the Indiana Constitution (Section 11). Because this case presents an issue of great public concern, we find the case is not moot despite the graduation of the students. With respect to the summary judgment, we find no reversible error in

the court's findings, which Penn argues are based upon extra-judicial sources of information. However, given recent authority from our supreme court, we must conclude that Penn's program comports with Section 11, except for the testing of student drivers for nicotine. Thus, we reverse in part, affirm in part, and remand.

## Facts and Procedural History

Penn is a public school system encompassing 125 square miles of property in northern Indiana. In the 1997–98 school year, 9,664 students were enrolled in the district; 2,863 students attended Penn High School. As part of a statewide program, in 1993, 1995, and 1997, all sixth, eighth, tenth, and twelfth graders in Penn schools were surveyed regarding drug use. The results showed that students at Penn were "much more likely" than the national average to use "gateway drugs," defined as alcohol and tobacco, and had a "higher than average use" of "most other types of drugs." Supp. Record p. 10.

Confronted with the 1993 and 1995 survey results, the Penn School Board (School Board) formed a Substance Abuse Awareness Committee to develop a plan for reducing student use of alcohol, tobacco, and other drugs. After receiving the Awareness Committee's report, the School Board created a Drug Testing Investigation Committee, composed of students, parents, and school personnel, to study drug testing as a method of reducing student substance abuse. The Drug Testing Investigation Committee recommended that suspicionless student drug testing be part of Penn's drug prevention program. That recommendation eventually became part of Policy 360, entitled "Student Testing for Drugs, Alcohol, and Tobacco," which was approved by the School Board on May 26, 1998, and implemented during the 1998–99 school year.

### Policy 360

Policy 360 initially established five categories of students, grades six through twelve, who would be subject to drug testing. Two categories are implicated here. First, all students who participate in extracurricular activities, including athletics, are required to submit to random suspicionless urinalysis. Extracurricular activities for testing purposes do not include activities where the student receives a grade. After the student attends a drug education class, the student and the student's parent are required to sign a written consent form. Refusal to do so means that the student may not participate in the extracurricular activity.

The second category includes students who seek school parking permits, a requisite for parking on school property. Student drivers are subject to the same testing, consent, and education requirements as are participants in extracurricular activities. No parking permits are issued without a signed consent from the student and parent.[1]

Students in extracurricular activities were selected for suspicionless drug testing due to the elevated alcohol and drug use at Penn, as well as publicized incidents regarding alcohol abuse. The latter included the temporary suspension from

---

1. The other categories included students and staff who volunteered to be part of the random drug testing pool and students who were tested based upon reasonable suspicion. Those categories are not at issue here. Additionally, students who had committed a disciplinary infraction were once required to submit to a drug test before returning to school. The Seventh Circuit Court of Appeals held that mandatory drug testing of a student who had been suspended violated the Fourth Amendment of the United States Constitution. *Willis v. Anderson Cmty. Sch. Corp.*, 158 F.3d 415 (7th Cir.1998), *cert. denied*, 526 U.S. 1019, 119 S.Ct. 1254, 143 L.Ed.2d 351 (1999). After *Willis* was decided, Penn stayed drug testing of suspended students.

competition of 14 members of the football team who had been drinking on school property. Student drivers were included, in part, due to "a rash of serious accidents involving students and alcohol in the community." Supp. Record p. 11.

### Testing Procedures

Under the random drug testing component of Policy 360,[2] students who return signed consent forms are assigned numbers, which are placed into a pool and randomly selected by an independent testing laboratory. When the chosen numbers are reported to the school, a monitor, usually one of two athletic directors, escorts the student to an office where a "health paraprofessional" provides the student with a private restroom. Supp. Record p. 18. Originally, under Policy 360, the student was to identify any drug or prescription medication the student was taking, and that information was documented on the "chain of custody form." Record p. 22. At some point that part of Policy 360 was amended so that students are presently asked "to voluntarily identify" such medications. Supp. Record p. 470.

The monitor visually checks the stall, flushes the toilet, and treats the water with dye. The student washes his or her hands with water only. Thereafter, the student privately collects urine in a specimen container and gives the container to the monitor, who documents any unusual circumstances and visually checks the specimen for signs of contamination. The specimen is then sealed, dated, and temporarily stored in a secured area.

Numbered samples are sent to a hospital toxicology laboratory where they are screened for amphetamines, barbiturates, benzodiazepines, cocaine, opiates, phencyclidine (PCP), cannabinoids (marijuana), ethanol (alcohol), and cotinine (nicotine

metabolite). Positive tests are confirmed by re-testing. Resultant student drug profiles are provided to a designated school official, who shares the results with the student's parents or guardian. School staff is provided the information on a need-to-know basis only and may not divulge test results to anyone other than the student and parent except under court order.

The school pays for the testing, except that parents must pay for a third positive test. Generally, after a positive test result, Penn works with the parent to provide "evaluation and/or treatment as indicated." Supp. Record p. 18. Students who test positive or who refuse to submit to a drug test "may be subject to exclusion from any extracurricular activities and/or revocation of their parking privileges," but they "are not subject to suspension, expulsion, detention, or any other discipline in connection with the academic school day." Supp. Record p. 454. An exception exists for student drivers testing positive for nicotine, as explained below.

### Origin and History of Case

Tianna Joy, Candace Petill, and Elizabeth Ward had applied for permits in order to park in designated lots at Penn High School, where they were students. As a condition of obtaining the parking permits, they and their parents were required to execute the Penn drug testing program consent form. As a condition of participation in extracurricular theater productions, Marci Stephens and her parents executed a similar form.

On October 28, 1998, Joy and Steven Ward, Elizabeth's father, filed a Motion for Preliminary Injunction and Declaratory Judgment in the St. Joseph Superior Court, alleging that Penn's suspicionless drug testing policy violates both the United States and the Indiana Constitutions.

---

**2.** Random drug testing is performed on the volunteer category as well as student drivers

and students participating in extracurricular activities.

Penn removed the case to federal court, and moved to dismiss due to several procedural defects. With the court's permission, Linda Petill, her daughter, Tiffany, and, later, Candace Petill were added as plaintiffs. Upon motion, the federal district court severed the state constitutional claims and remanded that part of the case to the St. Joseph Superior Court.

On July 15, 1999, Penn moved for summary judgment, and the Students responded with a cross-motion for summary judgment. Meanwhile, on May 12, 2000, the Seventh Circuit Court of Appeals issued an opinion finding Policy 360 constitutional under the Fourth Amendment, except as it applied to the testing of student drivers for nicotine. *Joy v. Penn–Harris–Madison Sch. Corp.*, 212 F.3d 1052 (7th Cir. 2000). In response, Penn amended Policy 360 to read: "A student driver will not be subject to consequences for a positive test for tobacco." Supp. Record p. 470.

Approximately three months later, this court issued its unanimous opinion in *Linke v. Northwestern School Corp.*, 734 N.E.2d 252 (Ind.Ct.App.2000), *aff'd on reh'g.* There, we held that Section 11 required individualized suspicion before the Northwestern School Corporation could test schoolchildren for alcohol, tobacco, and other drugs. Finding this case legally indistinguishable from *Linke*, on September 29, 2000, the trial court granted summary judgment in favor of the Students. The court ordered Penn to "withdraw Policy 360 in so far as it permits random suspicionless urinalysis of the Citizens of the State of Indiana who attend its schools." Record p. 498.

Penn filed its praecipe on October 17, 2000.[3] Asserting that *Linke* controlled the

issue presented here, Penn asked the Indiana Supreme Court to transfer and consolidate this case with *Linke*, which was then the subject of a petition to transfer. On March 5, 2001, the supreme court accepted transfer in *Linke*, automatically vacating our opinion. *Linke v. Northwestern Sch. Corp.*, 763 N.E.2d 972 (Ind.2001); Ind. Appellate Rule 58(A). Thereafter, the supreme court requested that we lift the stay in this case. We complied, and the parties completed the briefing process. Without consolidating the two cases, on March 5, 2002, our supreme court issued its opinion in *Linke*, reversing this court's decision and holding that the Indiana Constitution did not proscribe Northwestern's random suspicionless drug testing of students. *Linke v. Northwestern Sch. Corp.*, 763 N.E.2d 972 (Ind.2002) (examining program in context of both Section 11 and Article 1, Section 23). It is from this rather unusual procedural posture that we now turn to the issues presented.

## Discussion and Decision

Penn argues that the entire case is moot and should be dismissed. In challenging the trial court's grant of summary judgment in favor of the Students, Penn also claims that (1) the court improperly relied upon evidence outside the record, and (2) Policy 360 meets the reasonable test of Section 11. We first consider the mootness issue.

### I. Mootness

■ Seeking to dismiss this appeal, Penn insists that "this entire case is now moot" because the complaining students have graduated and, thus, can no longer benefit from injunctive relief. Appellant's Br. p. 30.[4] The Students counter that the age of the case is due, in part, to Penn's

3. Given that Penn initiated this appeal before January 1, 2001, the appeal is governed by the former Rules of Appellate Procedure.

4. Penn observes that Tiffany Petill was not subject to suspicionless drug testing. The school corporation also claims that parents Linda Petill and Steven Ward have no stand-

petition to consolidate this case in the supreme court and that the claims raised are capable of repetition yet may evade review. For example, the Students point out that student drivers are at least sophomores in high school and that, in order to gain relief, those students have little more than a two-year window to complete the legal process.

■ An appeal is moot when it is no longer live and the parties lack a legally cognizable interest in the outcome or when no effective relief can be rendered to the parties. *Lake County Sheriff's Corr. Merit Bd. v. Peron*, 756 N.E.2d 1025, 1027 (Ind.Ct.App.2001). To demonstrate that this case is moot, Penn cites federal decisional law. *See Stotts v. Cmty. Unit Sch. Dist. No. 1*, 230 F.3d 989 (7th Cir.2000) (holding that the action was moot due to graduation of the student who had been suspended from the basketball team because of a tattoo); *Bd. of Educ. of Oak Park v. Nathan R.*, 199 F.3d 377 (7th Cir.2000) (holding that whether the school must provide services to a special education student during his expulsion was moot due to the student's graduation from high school), *cert. denied*, 531 U.S. 822, 121 S.Ct. 65, 148 L.Ed.2d 30 (2000); *Bd. of Educ. of Downers Grove Grade Sch. Dist. No. 58 v. Steven L.*, 89 F.3d 464 (7th Cir.1996) (holding that the case was moot where the challenge involved a learning disabled child's individualized educational plan for the fifth grade and the child was about to enter high school), *cert. denied*, 520 U.S. 1198, 117 S.Ct. 1556, 137 L.Ed.2d 704 (1997). Article III of the United States Constitution limits the jurisdiction of federal courts to actual cases and controversies, but the Indiana Constitution contains no similar restraint. *Matter of Lawrance*, 579 N.E.2d 32, 37 (Ind.1991). Thus, while moot cases are typically dismissed, Indiana courts have long recognized that a case may be decided on its merits where that case involves a question of great public interest. *Id.* Cases falling within the public interest exception generally involve issues likely to recur. *Id.*

This case involves a matter of constitutional proportions. In addition, unlike the cited federal cases involving a single student, the issue before us involves all sixth to twelfth grade students in extracurricular activities and all student drivers in the Penn school district. The trend toward school drug testing has engendered a number of court challenges but, until recently, cases arising in Indiana have largely been examined under the United States Constitution. *See, e.g., Willis v. Anderson Cmty. Sch. Corp.*, 158 F.3d 415 (7th Cir.1998) (striking down drug testing of students suspended from school), *cert. denied*, 526 U.S. 1019, 119 S.Ct. 1254, 143 L.Ed.2d 351 (1999); *Todd v. Rush County Sch.*, 133 F.3d 984 (7th Cir.1998) (allowing suspicionless drug testing of high school students participating in extracurricular activities), *petition for reh'g en banc denied*, 139 F.3d 571 (7th Cir.1998), *cert. denied*, 525 U.S. 824, 119 S.Ct. 68, 142 L.Ed.2d 53 (1998); *Schaill v. Tippecanoe County Sch. Corp.*, 864 F.2d 1309 (7th Cir.1988) (upholding random drug testing for interscholastic athletes and cheerleaders), *reh'g denied.*[5]

---

ing. To support that claim, however, Penn merely cites and incorporates by reference its arguments and citations submitted in its brief to the trial court. Nothing in our appellate rules allows for such. *Pluard ex rel. Pluard v. Patients Comp. Fund*, 705 N.E.2d 1035, 1038 (Ind.Ct.App.1999), *trans. denied.* In any event, the issue of the parents' standing does not change our review of the case, as other named plaintiffs have standing to prosecute this action. Thus, we need not address the standing issue.

**5.** The federal debate is not over. Recently, the United States Supreme Court granted certiorari in *Earls v. Board of Education of Tecumseh Public School District*, 242 F.3d 1264 (10th Cir.2001), where the Tenth Circuit

*Linke* was the first pronouncement from our supreme court on the subject. Contrary to Penn's suggestion, however, that decision does not immunize every Indiana school district's drug testing program. Indeed, in this case, we have a federal court decision holding that part of Policy 360, the nicotine testing of student drivers, is unconstitutional under the Fourth Amendment. *Joy*, 212 F.3d at 1067. Although our decision today may have little practical effect on the students prosecuting this case, as the foregoing demonstrates, the issue presented is one that deserves consideration, as it is likely to recur.

## II. Summary Judgment

We now turn to Penn's challenge to the grant of summary judgment in favor of the Students. Summary judgment is appropriate when the designated evidence shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Wisniewski v. Bennett*, 716 N.E.2d 892, 894 (Ind.1999) (citing Ind. Trial Rule 56(C)). When reviewing an entry of summary judgment, we stand in the shoes of the trial court. *City of Gary v. Ind. Bell Tel. Co.*, 732 N.E.2d 149, 153 (Ind.2000), *reh'g denied.* We do not reweigh the evidence but consider the facts in a light most favorable to the nonmoving party. *Id.*

■ Findings of fact are neither required nor prohibited in cases decided by summary judgment. *Id.* Although specific findings aid our review of a summary judgment ruling, they are not binding on this court. *Id.; see Rice v. Strunk*, 670 N.E.2d 1280, 1283 (Ind.1996) (differentiating Indiana Trial Rule 52 findings from findings entered with summary judgment). The fact that there are cross-motions for summary judgment does not alter our standard of review. *Hoosier Ins. Co. v. Audiology Found. of Am.*, 745 N.E.2d 300, 306 (Ind.Ct.App.2001), *reh'g denied, trans. denied.*

### A. Findings

■ Penn insists that the trial court's findings show that the court ignored competent evidence and, instead, relied upon extra-judicial sources of information. Penn alludes to several findings with which it disagrees as well as the judge's mention of his granddaughter, a student at Penn High School, and of personal feedback regarding Policy 360. The court also referenced a "coffee" once shared with Earl Warren, then-retired Chief Justice of the United States Supreme Court. The trial court warned, "If we teach our children that it is permissible to ignore the civil rights of the young, or students or other powerless groups, America will surely reap the whirlwind." Record p. 497. Claiming error in these and similar findings, Penn requests that we reverse the summary judgment ruling or remand the case for new fact-finding.

■ Because we review the designated evidence de novo, any specific findings unsupported by the evidence are not, in themselves, grounds for reversal. Also, we are disinclined to remand for findings when findings were not required in the first place. Reviewing the order as a whole, we note that the judge's personal remarks comprise less than two pages of his nearly eight-page "opinion," which also cites this court's then viable decision in *Linke*, as well as numerous other cases and one law review article. We construe those personal comments as a reflection of a seasoned jurist's enduring passion for the freedoms we enjoy as Hoosiers.[6] Ac-

---

Court of Appeals held that the school's random urinalysis drug testing of all students participating in competitive extracurricular activities violates those students' Fourth Amendment rights.

6. Judge George N. Beamer was first elected to the trial bench in 1973. INDIANA JUDGES DIRECTORY 139 (Indiana Judicial Center 1999).

cordingly, we find no reversible error in this issue.

## B. Article 1, Section 11

In a second challenge to the grant of summary judgment in favor of the Students, Penn claims that its drug testing program is reasonable under Section 11, which protects "[t]he right of the people to be secure in their persons ... against unreasonable search or seizure...." Although Section 11 is nearly identical to the Fourth Amendment of the United States Constitution, our analysis of claims arising under Section 11 is separate and distinct from Fourth Amendment analysis. *Linke*, 763 N.E.2d at 977.

It is undisputed that Penn's urinalysis drug testing constitutes a Section 11 search. *See id.* That search, however, is conducted by a school corporation rather than by law enforcement officers, and test results are neither volunteered to law enforcement nor used for internal disciplinary purposes. Under these circumstances, our supreme court has directed us to determine the reasonableness of a search by balancing the interests of the Students against those of Penn. *See id.* at 978. Specifically, to decide whether Policy 360 is reasonable under the totality of the circumstances, we "weigh the nature of the privacy interest upon which the search intrudes, the character of the intrusion that is complained of, and the nature and immediacy of the governmental concern." *See id.* at 979 (adopting analytical approach of *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 658–60, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995)). Focusing on these three factors, we compare the drug testing policies of Penn and Northwestern, the school corporation in *Linke*, to ascertain whether there are significant differences to justify a different result.

### 1. Privacy Interest

*Linke* and this case both involve random drug testing of students who participate in extracurricular activities, including athletics, and of student drivers. In *Linke*, grades seven through twelve were involved; Policy 360 also includes sixth graders. Our supreme court reasoned that student status is the chief consideration influencing our analysis of the privacy interests at issue. *Linke*, 763 N.E.2d at 979. The nature of a school's role "is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults." *Id.* (quoting *Vernonia*, 515 U.S. at 655, 115 S.Ct. 2386). Indiana recognizes that, regarding matters of discipline and the conduct of students, public schools stand in the relation of parents and guardians. *Linke*, 763 N.E.2d at 977; Ind.Code § 20–8.1–5.1–3(b). Given these factors, "students are entitled to less privacy at school than adults would enjoy in comparable situations." *Linke*, 763 N.E.2d at 980.

Under *Linke*, another relevant factor is consent. *Id.* In *Linke*, students wishing to participate in specified activities were required to consent to random drug testing. Written consent was also obtained from each student's parent or guardian. Similarly, in this case students seeking to participate in extracurricular activities and student drivers must "voluntarily agree" to the drug testing program after being informed of the testing protocol. Record p. 213. Parents also signed the consent form. Although without consent students could not participate in extracurricular activities or drive to school, the forfeiture of opportunity to obtain certain benefits does not render the consent forced. *Id.* at 981.

Judge Beamer retired on September 30, 2000, one day after entering the order in this case.

The *Linke* court also focused on whether the students involved had volunteered for an already regulated activity. *Id.* Policy 360 involves athletics, which are highly regulated, but no one in this action is a student athlete. One student participated in extracurricular theater productions. Non-athletic extracurricular activities are arguably less regulated, but participants must still comply with rules and requirements established by various activities or clubs. *Id.* Three other students had applied for school parking permits in order to park on school property. Student drivers are responsible for knowing and following "the driving and parking rules." Supp. Record p. 123. The students involved in the challenged aspect of Policy 360 have already subjected themselves to a higher degree of regulation than that imposed on the general student population. *See Linke,* 763 N.E.2d at 981. We conclude that the nature of the privacy interests upon which the search intrudes parallels that in *Linke.*

### 2. Character of Intrusion

The character of the intrusion also contributes to the reasonableness of a Section 11 search. *Id.* According to *Linke* methodology, relevant inquiries are the manner of acquiring a specimen, the substances disclosed by testing, the amount of discretion given to the testers, and the persons to whom results are disclosed. *Id.* at 981–82. We also consider whether the test is punitive or preventative and rehabilitative in nature. *Id.* at 982.

In *Linke,* the supreme court found drug testing by urinalysis reasonable where a computer-based system randomly selects individuals for testing. Upon selection, one student at a time is taken to a trailer, given a specimen bottle, and allowed to urinate in an area separated from the monitor by a closed door. The specimen is then sealed and sent to an independent laboratory where it is tested only for banned substances. If the first test result is positive, the specimen is retested. If the re-test is positive, the laboratory communicates the number of the student to the building administrator who alerts the student's principal. The principal identifies the student by reference to the specimen number, then holds a conference with the student and his or her parents at which time the student may submit documentation justifying a positive result, e.g., prescription medication. A student with a positive drug profile may be barred from participating in relevant activities for a period of time; however, the test results are neither volunteered to law enforcement nor used for internal disciplinary functions.

The method by which students are chosen for testing in this case is similar to that employed in *Linke,* including random selection and identification by number. Under Policy 360, a student whose number is chosen is escorted to a private area. After precautions are taken to avoid contamination, the student urinates in private. The sample is then sealed, and the student returns to the classroom. The collection process itself equates to the procedures utilized in *Linke.*

There is one notable difference in the process. Under original Policy 360, the student was required to divulge any over-the-counter or prescription medications being taken, and the monitor documented that information on the chain-of-custody form. Currently, the student is asked to "voluntarily identify" those medications. Supp. Record p. 470. Identification may still occur, however, before any testing is completed. In *Linke,* information regarding medications was disclosed only after a positive urine test. In this aspect, Policy 360 is more intrusive. Nevertheless, it appears that any information disclosed is treated as confidential, revealed only to

the monitor and to those who view the chain-of-custody form. Thus, the additional invasion is not significant. *See Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 660, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (holding same under similar facts).

Regarding substances revealed, urine in this case is tested for the presence of nine substances, including alcohol, nicotine, and other drugs. The testing profile in *Linke* includes similar substances and five additional ones.[7] As in *Linke,* tests are confirmed for reliability, and results of positive tests are shared with parents. Others are notified only on a need-to-know basis. Barring a court order, school personnel having knowledge of positive test results may not divulge those results to anyone but the student or parent. A similar level of confidentiality was implicated in *Linke.*

A final factor used to evaluate the character of the intrusion is whether the search is done for punitive or preventative and rehabilitative purposes. *Linke,* 763 N.E.2d at 982. A school corporation's punitive testing scheme is more intrusive upon a student's Section 11 privacy interest than is a non-punitive search conducted in furtherance of a school's custodial and protective role. *Id.* As mentioned previously, test results are not shared with law enforcement, and a positive test result does not subject a student to academic penalties or disciplinary measures such as suspension or expulsion. Except for nicotine, when there is a positive test result, Penn assists students and parents in acquiring education and intervention. As such, the policy generally can be characterized as preventative and rehabilitative, lessening the Students' privacy interests. *See id.*

### 3. Nature and Immediacy of Governmental Concern

We next examine Penn's interest in the suspicionless drug testing of participants in extracurricular activities and student drivers. As a basis of comparison, we turn to Northwestern's interest as described in *Linke.* There, Northwestern claimed a need to fight and deter drug abuse among its students in general and among its students who act as role models and representatives of the school in particular. The school asserted a related interest in insuring the health and safety of its students.

The *Linke* court focused on Northwestern's responsibility for supervising its students and for enforcing desirable behavior, noting that administrators were troubled that they were not properly fulfilling that function. In particular, surveys indicated a higher than average use of gateway drugs in the middle and high schools and an escalating drug problem on its middle and high school campuses. Also, three students had died in drug related incidents. Reasoning that deterring drug abuse by children in school is a legitimate concern, the supreme court noted the deleterious effects of drugs on children and on the entire school. *Id.* at 983.

Another consideration enlarging Northwestern's interest was that all relevant extracurricular activities had off-campus components, where students have more occasions "to be injured, to endanger fellow students, to transgress school rules, or to violate the law." *Id.* at 984. The supreme court reasoned that, where drug abuse increases the danger of participation in school-sponsored activities, such as school athletics, the school corporation's interest is strengthened. *Id.* Similarly,

---

7. In *Linke,* testing was performed for alcohol, amphetamines, anabolic steroids, barbiturates, benzodiazepines, cocaine metabolites, LSD, marijuana metabolites, methadone, methaqualone, nicotine, opiates, phencyclidine, and propoxyphene. *Linke,* 763 N.E.2d at 976 n. 3.

driving while intoxicated presents significant physical risks to drivers, their passengers, and pedestrians. *Id.* The *Linke* court also observed that, although there was no evidence that peers viewed students participating in testing activities as role models, the school held them out as such by submitting them to additional rules and by sending them to community functions as school representatives. *Id.* Finally, the supreme court recognized the school's interest in "experimenting with methods to deter drug use," which supported "interdiction efforts by giving students who represent the school in an organized activity a valid response to peers who may pressure them into using drugs." *Id.* at 984–85.

Here, Penn acted in conformity with its stated intention to create a safe and healthy environment for students. Significantly, Penn had evidence of a substantial and immediate drug abuse problem among its students. We share the Students' concern that surveys did not show that the students subject to drug testing are the ones using drugs. The failure to identify high-risk categories of students prevents the offering of targeted services for those students. Under *Linke*, however, that is not fatal. We find that Penn's interest in preventing substance abuse among its students is no less than that of Northwestern in *Linke*.

The record does not indicate the extent of off-campus activity implicated by Policy 360. In contrast to Northwestern, Penn tests participants in all extracurricular activities, not only those extracurricular activities with an off-campus component. In that regard, Policy 360 may cast a wider net.[8] However, we do not find that distinction significant, as Northwestern also tested students participating in specified co-curricular activities.

Also, like Northwestern, Penn portrayed students participating in athletics and extracurricular activities as role models and student representatives. For example, Penn defines certain qualities it expects of those students and, further, requires that they meet a level of academic achievement. Additionally, Penn has an interest in experimenting with methods for deterring drug use and in decreasing peer pressure to use drugs. Indeed, prior to Policy 360, Penn had instituted a program based upon education and suspicion-based testing only, but surveys reveal that the program was ineffective in curbing drug use among students. In contrast, the initial results of Policy 360 were encouraging. *See Vernonia*, 515 U.S. at 663–64, 115 S.Ct. 2386 (discussing efficacy of means as a consideration when determining reasonableness under Fourth Amendment analysis).[9]

In sum, we find little distinction between the nature and immediacy of Penn's interest in participants in extracurricular activities and that of Northwestern. Penn has a similarly a strong interest in preventing impaired students from driving while under the influence of "intoxicants." Supp. Record at 470. That implicates alcohol and other tested drugs. Nicotine, however, presents a more complicated matter. As the Seventh Circuit Court of Appeals reasoned:

> [T]he decision of [Penn] to test student drivers for the presence of nicotine is not so easily justified. Tobacco use is legal if a person is over 18 years of age. [Penn's] school policy validly prevents use of tobacco products on school grounds. However, if a student smokes

---

**8.** It is estimated that eighty percent of Penn High School students are involved in "some type of extracurricular activity." Supp. Record p. 461.

**9.** In varying degrees, Penn reported decreased use of substances, including cigarettes, alcohol, marijuana, cocaine, inhalants, and amphetamines.

at home, leaves the cigarettes at the house, drives to school, and is drug tested, the results would reveal the presence of nicotine. This student could be subject to sanctions under [Penn's] policy for a perfectly legal activity. In the absence of supporting data, this expansive view of the School's interest goes too far. Furthermore, [Penn] simply has not documented any serious risks associated with a student driving while using a tobacco product.

*Joy,* 212 F.3d at 1064. Accordingly, the Seventh Circuit found the random testing of student drivers for nicotine unconstitutional. *Id.* at 1067.[10]

For health reasons, Penn has an interest in deterring tobacco use among all schoolchildren. But we agree that the school's interest is not so encompassing as to include testing student drivers who may legally use tobacco off school grounds. Penn has not documented any serious risks associated with driving while using tobacco. Further, the school receives information about nicotine levels but does not act upon that information. Unlike Northwestern's program, Policy 360 provides for no consequences after a student driver tests positive for nicotine, either in the form of education or intervention. Therefore, we find Penn's interest in nicotine testing is negligible.

### Totality of the Circumstances

 Considering the totality of the circumstances, we are constrained to conclude that Policy 360, as it applies to participants in extracurricular activities, is sufficiently similar to the drug testing program examined in *Linke* to pass constitutional muster under Section 11. Applying *Linke,* we further find that Section 11 does not proscribe the random suspicionless testing of student drivers for alcohol and other non-tobacco-related drugs.

 Regarding nicotine testing of student drivers, however, the governmental interest does not justify the intrusion on the Students' liberty interests. We recognize that the additional intrusion may be minimal. However, under Policy 360 as amended, Penn receives information about a positive nicotine drug profile but, without any correlating benefit to the school district or to the student, its interest in that information is negligible. We find Policy 360 overly inclusive in that respect and, thus, unreasonable under Section 11. Accordingly, we reverse the grant of summary judgment in part, affirm in part, and remand for entry of summary judgment in conformance with this opinion.

Reversed in part, affirmed in part, and remanded.

RILEY, J., and MATTINGLY–MAY, J., concur.

---

10. The supreme court in *Linke* found no Section 11 bar to Northwestern's nicotine testing of student drivers in a program similar to unamended Policy 360. A question remains whether the Fourth Amendment offers more protection for student drivers than does Section 11. We need not address that question, however, because we review Policy 360 as it was amended in response to the Seventh Circuit's decision.